# Exhibit R



Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131 | tel 212.858.1000 | fax 212.858.1500

James M. Catterson
tel: +1.212.858.1048
james.catterson@pillsburylaw.com

_**Via E-Mail**_                                              March 12, 2026

Daniel A. Johnston, Esq.
Justine Barbieri, Esq.
The Willis Law Group, PLLC
60 Broadhollow Road
Melville, New York 11747
djohnston@thewillislawgroup.com
jbarbieri@thewillislawgroup.com

Re:  United States of America ex rel. Tradesman Program Managers, LLC v. Liakas
Law, P.C. et al., No. 1:25-cv-02859-JAV

Dear Counsel:

We write on behalf of Defendants Liakas Law, P.C., Dean N. Liakas, Stephen J. Liakas, and Nicholas Liakas (hereinafter collectively referred to as "Defendants") in the above-referenced matter and the Rule 11 motion (hereinafter referred to as the "Motion" or "Mot.") served on February 24, 2026.

Defendants hereby notify The Willis Law Group PLLC (hereinafter referred to as "Willis Law") that we intend to supplement and amend the Motion to incorporate the Honorable Nina Gershon's recent decision in Roosevelt Road Re, Ltd. and Tradesman Program Managers, LLC v. John Haggar, M.D., et al., No. 24-cv-01549, 2026 WL 682192 (E.D.N.Y. Mar. 11, 2026) (hereinafter referred to as "Haggar"), attached hereto as **Exhibit A**. We also recently notified the Court of this authority. See ECF Nos. 37 & 37-1. We reserve the right to amend the Motion to incorporate any additional authority that may come to our attention between now and when we file it.

In Defendants' Motion, we noted that two of Willis Law's actions brought under the Racketeer Influenced and Corrupt Organizations (hereinafter referred to as "RICO") Act were recently dismissed with prejudice. Mot. at 4. Haggar is the latest RICO complaint filed by Willis Law to be dismissed by a judge in this District. Relator is a plaintiff in each of these dismissed cases.

Haggar, which dismissed the complaint on the merits for failure to state a RICO claim or a RICO conspiracy claim, 2026 WL 682192, at *12–13, *15, underscores Defendants' argument in the Motion that the instant complaint was brought for an improper purpose and in bad faith. See Mot. at 11–13, 17. Willis Law's continued pursuit of its _qui tam_ claims

Daniel A. Johnston, Esq.
Justine Barbieri, Esq.
The Willis Law Group, PLLC

Page 2 of 2

against Defendants violates Rule 11's requirement that a pleading must not be presented for an improper purpose, such as to harass.

Accordingly, we reiterate our demand that Willis Law immediately withdraw the Complaint against Defendants. Absent withdrawal, Defendants will file the Motion, as supplemented, and seek all appropriate relief, including dismissal and sanctions.

Sincerely,

James M. Catterson
Partner

Encl.

4918-1526-7479

# Exhibit A

2026 WL 682192
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

ROOSEVELT ROAD RE, LTD.,
and TRADESMAN PROGRAM
MANAGERS, LLC, Plaintiffs,
v.
JOHN HAGGAR, M.D., et al., Defendants.

24-CV-1549 (NG)(CHK)
|
Filed 03/11/2026

**Attorneys and Law Firms**

William Clay, Aaron Eitan Meyer, Daniel A. Johnston, Kirk Willis, Pro Hac Vice, Olivia Taylor Knott, Michael A. Graves, The Willis Law Group, PLLC, Garland, TX, for Plaintiffs.

Alexander Martin Dudelson, Brooklyn, NY, Benjamin Max Pinczewski, Pinczewski & Shpelfogel, P.C., Brooklyn, NY, for Defendant Siddhartha Sharma.

Benjamin Max Pinczewski, Pinczewski & Shpelfogel, P.C., Brooklyn, NY, for Defendants Surgicore, LLC, Surgicore 5th Avenue, LLC.

Torrey Kaufman Young, Marc Lee Mukasey, Thomas Elliott Thornhill, Seyfarth Shaw LLP, New York, NY, for Defendants NY Ortho Sports Medicine & Trauma, PC, Jeffrey Kaplan, Adrian Puia.

Torrey Kaufman Young, Marc Lee Mukasey, Thomas Elliott Thornhill, Seyfarth Shaw LLP, New York, NY, Benjamin Max Pinczewski, Pinczewski & Shpelfogel, P.C., Brooklyn, NY, for Defendant Matthew Grimm.

Paul Hans Schafhauser, Todd L. Schleifstein, Greenberg Traurig LLP, Florham Park, NJ, for Defendants Joseph Weinstein DO, PC, Joseph Weinstein.

Jessica M. Baquet, Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, Uniondale, NY, Briana Enck-Smith, Daniel E. Shapiro, Ruskin Moscou Faltischek, P.C., Uniondale, NY, for Defendants University Orthopedics of New York, PLLC, Steven Touliopoulos, Charles DeMarco, Andrew Cruz.

Guy Petrillo, Christina Karam, David Adam Hoffman, Petrillo Klein & Boxer LLP, New York, NY, for Defendants Kolb Radiology, PC, Thomas Kolb.

Matthew J. Conroy, Sarah McMahon, Stephen Henry Broer, Schwartz, Conroy & Hack, PC, Garden City, NY, for Defendant Lenox Hill Radiology and Medical Imaging Associates, PC.

J. Patrick Carley, III, Sean Edward Kelly, Traub Lieberman Straus & Shrewsberry LLP, White Plains, NY, for Defendants Fogelgaren Forman & Bergman, LLP, Eric Fogelgaren, Jonathan Forman.

Joseph John Ortego, Nixon Peabody LLP, Melville, NY, John J. Weinholtz, Nixon Peabody LLP, Buffalo, NY, for Defendants Gorayeb & Associates, PC, Christopher Gorayeb.

**OPINION AND ORDER**

NINA GERSHON United States District Judge

**\*1** Plaintiffs Roosevelt Road Re, Ltd. ("Roosevelt") and Tradesman Program Managers, LLC ("Tradesman") (collectively, "Plaintiffs") bring this action against legal and medical professionals and corporations, alleging a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), RICO conspiracy, two state law claims, and a claim for a declaratory judgment. Plaintiffs allege that, since at least 2018, the defendants have engaged in a fraudulent scheme that involves filing workers' compensation claims and/or personal injury lawsuits on behalf of construction workers who were not actually injured on the job and/or are fabricating or exaggerating their injuries to inflate the settlement value of claims and lawsuits brought against their employers and others insured by insurance companies that have reinsurance contracts with Roosevelt. Now pending before the court are eight motions to dismiss Plaintiffs' First Amended Complaint ("FAC"): a "Joint Motion" filed by all defendants other than Surgicare of Westside, LLC (collectively, "Defendants") and seven "Supplemental Motions," each filed by a separate defendant or group of related defendants.[1]

**THE COMPLAINT**

Unless otherwise stated, the following facts are drawn from the FAC and are assumed to be true for purposes of adjudicating Defendants' motions to dismiss. Roosevelt is a Bermudian "reinsurer which underwrites policies and provides reinsurance." (FAC, ¶ 170) The FAC does not provide any details regarding the primary insurers who have reinsurance contracts with Roosevelt or the risks that those reinsureds may have ceded to Roosevelt. Rather, the pleading alleges only that Roosevelt, which is "authorized to conduct business in New York" (*Id.*, ¶ 3), "underwrites policies and provides reinsurance that covers the various workers' compensation claims and personal injury lawsuits filed and prosecuted by the ... Defendants" in this action. (*Id.*, ¶ 170)

Tradesman is "a management general agency that provides management services to various insurers and reinsurers, including ... Roosevelt." (*Id.*, ¶ 180) In this capacity, Tradesman provides "services from underwriting through claims handling and subsequent administrative and legal actions" with respect to both general liability and workers' compensation insurance. (*Id.*) The FAC alleges that "Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the ... Defendants." (*Id.*, ¶ 181)

The FAC names 19 defendants and divides them into two categories: the "Legal Services Defendants" and the "Medical Provider Defendants." There are six defendants in the former category: Gorayeb & Associates, P.C. ("G&A") and its principal, Christopher J. Gorayeb (collectively, the "Gorayeb Defendants") and Fogelgaren Forman & Bergman, LLP ("FF&B"), and its named partners, Eric Fogelgaren, Jonathan Forman, and Robert Bergman (collectively, "the Fogelgaren Defendants").[2] The other 13 defendants are in the latter category; two of these have already been dismissed from this action. *See* fn. 1, *supra*. The 11 remaining Medical Provider Defendants are Siddhartha Sharma, DPM; Surgicore 5th Avenue LLC, a/k/a Fifth Avenue Surgery Center, LLC ("Surgicore"); Lenox Hill Radiology and Medical Imaging Associates, P.C. ("Lenox Hill"); Joseph Weinstein, D.O., and Joseph Weinstein, D.O., P.C. (collectively, the "Weinstein Defendants"); Thomas M. Kolb, MD, and Kolb Radiology P.C. (collectively, the "Kolb Defendants"); and NY Ortho, Sports Medicine & Trauma, P.C. ("NY Ortho"); Jeffrey Stone Kaplan, MD; Matthew P. Grimm, MD; and Adrian Puia, RPT (collectively, the "NY Ortho Defendants").

**\*2** The FAC alleges that, "[f]rom at least 2018 to the present, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others." (FAC, ¶ 27). This "Fraud Scheme" allegedly worked as follows: first, "Runners," acting at the direction of the Gorayeb Defendants, recruited construction workers ("Claimants") to stage construction accidents at their workplaces. (*Id.*, ¶ 30) The Runners told Claimants to "fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment." (*Id.*, ¶ 32) The Runners then referred and/or transported Claimants to G&A, which "generally" paid the Runners a "referral fee" for their services. (*Id.*, ¶¶ 33–34)

G&A represented the Claimants in personal injury lawsuits against parties involved in the construction project on which the Claimant was allegedly injured. If New York Workers' Compensation Law ("WCL") precluded a lawsuit against some of those parties, G&A would refer the Claimant to FF&B, which had an office on the same floor as G&A. The FAC alleges that the Gorayeb Defendants and the Fogelgaren Defendants had some sort of "agreement and understanding that [FF&B] would represent Claimants in workers' compensation claims and [G&A] would represent Claimants in personal injury lawsuits, in furtherance of the Fraud Scheme." (*Id.*, ¶ 37) But the FAC does not allege any facts relating to the alleged agreement or understanding. The FAC states only that, "[f]or most Claimants, both personal injury lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Defendants." (*Id.*, ¶ 38)

During their representation of the Claimants, the Gorayeb Defendants and Fogelgaren Defendants would direct the Claimants to seek medical services from various Medical Provider Defendants, who allegedly "provided false diagnoses, use of their facilities and resources, and unnecessary, excessive, unwarranted and costly medical services and/or medical services that were not causally related to the alleged workplace accident." (*Id.*, ¶ 42) The Gorayeb Defendants then used the false diagnoses and the record of extensive medical services to "fraudulently inflate the settlement values of personal injury lawsuits in order to extract greater settlement from general liability carriers, including from Plaintiff Roosevelt." (*Id.*, ¶ 44) Similarly, the Fogelgaren Defendants used the diagnoses and records to "fraudulently inflate the settlement values of workers' compensation claims in order to extract greater settlement from workers' compensation carriers, for which Plaintiff

Tradesman provides administrative, investigative and support services." (*Id.*, ¶ 45)

While the FAC alleges that "the Medical Provider Defendants received compensation from workers' compensation insurance" for their services to the Claimants, (*id.*, ¶ 42), it does not allege that they received money from the Legal Services Defendants. Rather, the FAC states that "[t]he Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for higher settlement values, the Gorayeb Defendants and the Fogelgaren Defendants will continue to funnel patients to their offices." (*Id.*, ¶ 43) The FAC also does not allege any relationship or agreements between the Medical Service Providers, other than ordinary medical referrals.

Although the FAC alleges that the Fraud Scheme resulted "in a significant number of fraudulent claims being filed," (*id.*, ¶ 46), it focuses on four Claimants to illustrate how the alleged Fraud Scheme worked. These Claimants are not named as defendants and are identified only as Claimant A, B, C, or D. Each of the four claimed injuries allegedly resulting from a workplace accident; Claimants A and D claimed that they were struck by falling objects and Claimants B and C alleged that they fell from heights. Each Claimant retained G&A, which "directed the aggressive, unnecessary medical treatment" of the Claimant and filed a personal injury lawsuit on the Claimant's behalf. (*Id.*, ¶¶ 48, 58, 69, 80) Each Claimant also hired FF&B to represent him before the New York Workers' Compensation Board ("WCB").

 **\*3**  The FAC alleges that, after hiring the Legal Services Defendants and visiting one or more of the Medical Provider Defendants, Claimants had their relatively minor injuries transformed into serious conditions that required costly diagnostic and remedial procedures. For example, Claimant A was initially diagnosed with a contusion, which was treated with a shot for pain and over-the-counter pain relievers. Later, however, he was diagnosed with a tear of the left shoulder rotator cuff that required arthroscopic surgery and a disc herniation that required back fusion surgery. He was also given a series of epidural steroid injections and 149 physical therapy sessions from, among others, the NY Ortho Defendants.

With a few exceptions, the FAC does not specify which of the Medical Provider Defendants treated the four Claimants, or the nature of the services they provided. However, those details are contained in six affidavits which are attached to the FAC as Exhibits 1–6 (the "Affidavits"). Each of the Affidavits is from a medical expert who was retained by Plaintiffs' counsel to review the medical records of one or more of the four Claimants and to provide opinions regarding the treatment they received. Two of the Affidavits are from orthopedic surgeons, one is from a neurologist, and another is from a neuropsychologist and licensed clinical psychologist. A fifth Affidavit is from a diagnostic radiologist and the sixth is from a physiatrist. None of the experts personally examined any of the Claimants. Rather, they were provided with medical records relating to one or more Claimant, which are listed in the expert's Affidavit.

Read together, the list of medical records and the experts' summaries of those records provide a detailed chronology of each Claimant's medical treatment. NY Ortho and Kolb Radiology saw each of the four Claimants and Lenox Hill and Puia saw three of the four. Claimant D was treated at Surgicore's facility. But because the experts only reviewed medical records, the Affidavits do not provide any information regarding the relationships between the Medical Provider Defendants, other than to occasionally state or imply that one provider referred a Claimant to another of the providers for radiological studies, physical therapy, or the like. The Affidavits also contain no information regarding relationships or interactions between the Legal Services Defendants and the Medical Provider Defendants.

The FAC describes the involvement of all Medical Provider Defendants in the Fraud Scheme in nearly identical, general terms. It alleges that, since 2018, NY Ortho, the Kolb PC, Lenox Hill, the Weinstein PC, Sharma, and Surgicore have "been involved in the medical treatment of numerous Claimants ... in furtherance of the Fraud Scheme." (FAC, ¶¶ 106, 115, 122, 129, 151, 158) The FAC alleges that the two doctors employed by NY Ortho (Drs. Kaplan and Grimm) and Drs. Weinstein and Sharma provided services that "were not medically necessary and/or not causally related" to the Claimants' alleged accidents (*id.*, ¶¶ 107, 108, 130, 152); that radiologists Kolb and Lenox Hill provided "inaccurate findings of the Claimants' conditions" and "radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions" (*id.*, ¶¶ 116, 123); and that Surgicore permitted its ambulatory surgical facilities to be used to perform procedures that were not medically necessary (*id.*, ¶ 160). The three defendants employed by NY Ortho (Kaplan, Grimm, and Puia), Kolb, Lenox Hill, Weinstein, Sharma, and Surgicore then "caused the submission of

fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the ... WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident." (*Id.*, ¶¶ 110, 117, 124, 131, 153, 161) The FAC alleges that the Medical Provider Defendants profited from the Fraud Scheme both from receiving reimbursements for the unnecessary, excessive, unwarranted and/or costly services and from increasing the number of patients who were referred to them pursuant to the scheme.

**\*4** The FAC's allegations concerning direct interactions between Legal Services Defendants and Medical Service Providers are conclusory. The FAC alleges that the Gorayeb Defendants and Fogelgaren Defendants "directed ... Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide fraudulent medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants." (*Id.*, ¶¶ 96, 102) And the FAC alleges that the three defendants employed by NY Ortho (Kaplan, Grimm, and Puia), Kolb, Lenox Hill, Weinstein, Sharma, and Surgicore "provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits." (*Id.*, ¶¶ 112, 119, 126, 133, 155, 163) However, the pleading does not allege facts to suggest that there were any express agreements between the parties.

Similarly, the FAC contains very few allegations of interactions between the individual Medical Provider Defendants and no facts to suggest any agreements between them. It alleges that Dr. Kaplan referred Claimants to his colleagues—defendants Grimm and Puia—"for unnecessary injections and physical therapy" and to the Kolb Defendants for "unnecessary imaging services." (*Id.*, ¶ 107). It also alleges that Dr. Grimm, a pain management specialist, referred Claimants to his colleague, Puia, for "unnecessary physical therapy." (*Id.*, ¶108) In addition, the FAC alleges that Kaplan, Grimm, Puia, Lenox Hill, Weinstein, Sharma, and Surgicore "provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation

would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident." (*Id.*, ¶¶ 111, 125, 132, 154, 162) However, the FAC does not allege specific facts to support the allegations regarding the Medical Providers' knowledge of what use would be made of the documentation they generated.

The FAC alleges only two federal claims: a RICO claim and a RICO conspiracy claim. The RICO claim alleges that all 19 defendants "constituted an 'enterprise' as ... defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce." (FAC, ¶ 185) It also alleges that each defendant "participated in the operation or management of the enterprise," but that "Gorayeb orchestrated, coordinated and led" it. (*Id.*)

The RICO claim further alleges that "[e]ach of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c)." (FAC, ¶ 187) The "pattern of racketeering activity" allegedly involved 93 predicate acts, which are listed in Exhibit 7 to the FAC in a formulaic manner. These acts allegedly occurred between February 8, 2018, and November 22, 2023, and purportedly "involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents." (FAC, ¶ 189) All 93 predicate acts allege mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343, although, in most cases, Plaintiffs plead the mailing and wiring of the allegedly fraudulent documents on information and belief. Four of the 93 predicate acts also allege bribing a witness in violation of New York Penal Code § 215 but do not include specific facts to support such allegations.

**\*5** The RICO conspiracy claim alleges that from at least 2018 to the present, defendants "did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity ...." (*Id.*, ¶192) The

"pattern of racketeering activity" and the predicate acts are alleged to be the same as those underlying the RICO claim.

In addition to the RICO and RICO conspiracy claims, the FAC advances two state law claims. Count III of the FAC alleges common law fraud, and Count IV alleges an equitable claim for unjust enrichment. The fifth and final claim contained in the FAC seeks declaratory relief pursuant to 28 U.S.C. § 2201.

The "Joint Motion" and the seven pending "Supplemental Motions" raise many arguments, almost all of which are addressed below.[3] As explained below, the court rejects Defendants' arguments that it lacks Article III standing and should abstain from exercising jurisdiction pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The court also rejects the argument that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, preempts Plaintiffs' RICO and RICO conspiracy claims. But the court agrees with Defendants that there are three fundamental deficiencies in the FAC's RICO and RICO conspiracy claims: 1) the lack of allegations establishing proximate causation under RICO, 2) the failure to allege facts to establish an association-in-fact enterprise; and 3) the failure to allege facts from which one can infer that Defendants agreed to engage in conduct constituting a RICO violation.[4]

## DISCUSSION

### A. Standing

The first argument raised in the Joint Memorandum of Law in Support of Defendants' Motions to Dismiss (the "Joint Memo") is that the FAC does not adequately allege "Article III standing."[5] Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2). "For there to be a case or controversy under Article III, [a] plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Since "Article III standing ... [is] a limitation on the authority of a federal court to exercise jurisdiction," *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006), this issue, like any jurisdictional question, must be addressed before the court evaluates the merits of any other claims. *See Lugo v. City of Troy, N.Y.*, 114 F.4th 80, 86 n.1 (2d Cir. 2024).

**\*6** "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Given that standing may be challenged "at any stage in the litigation," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016), "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation,' " *TransUnion LLC*, 594 U.S. at 431 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Where, as here, "a case is at the pleading stage, the plaintiff must clearly ... allege facts demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted). Those factual allegations must be "plausible" and "nonconclusory." *Lugo*, 114 F.4th at 87.

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. The injury in fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

In this case, Plaintiffs have adequately alleged Article III standing. With respect to Roosevelt, the FAC alleges that the Claimants' fabricated and exaggerated claims caused the reinsurer to incur unwarranted "expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal [Services] Defendants on behalf of Claimants." (FAC, ¶ 171) The FAC further alleges that, "[b]ut for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would [be] less significant, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses." (*Id.*, ¶ 172) The damages sought in this action would redress these injuries by compensating Roosevelt for the inflated reimbursements.

With respect to Tradesman, the FAC alleges that this plaintiff "made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service[s] Defendants as part of the Fraud Scheme." (*Id.*, ¶ 181) The FAC alleges that, as a result of

the Claimants' falsified and exaggerated claims, Tradesman incurred "expenses ... for the administration of these claims and the retention of additional staff to perform investigative and support services ...." (*Id.*, ¶ 183(b)) The damages sought in this action would redress these injuries by compensating Tradesman for the additional expenses.

### B. *Burford* Abstention

The Joint Memo argues that, even if the court has jurisdiction, it should abstain from exercising it pursuant to *Burford v. Sun Oil Co.*, *supra*. "*Burford* abstention is an extraordinary and narrow exception ... to a federal court's duty to exercise jurisdiction." *Tribune Co. v. Abiola*, 66 F.3d 12, 17 (2d Cir. 1995) (internal quotation marks omitted). The Supreme Court has "distilled the principle" underlying this abstention doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

**\*7** *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted). The Second Circuit has held that this language, which limits the abstention requirement to federal courts "sitting in equity," "leaves little doubt that *Burford* abstention is generally appropriate only in cases where equitable relief is sought." *Tribune Co.*, 66 F.3d at 16 (2d Cir. 1995).

The FAC's first four claims principally seek "actual and consequential damages." (FAC, pp. 42, 44, 45, 47) The Second Circuit has "refused to abstain under *Burford* ... where claims for money damages were at issue." *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000). As the Second Circuit has made clear, "abstention and dismissal are inappropriate when damages are sought, even when ... [the court] would dismiss otherwise identical claims for declaratory and injunctive relief." *Id.*

Even if this case presented the "highly unusual circumstances" in which "claims for money damages..., if granted, might unduly interfere with a state proceeding or order, and thus make it appropriate for a district court to abstain on *Burford* grounds," *Tribune Co.*, 66 F.3d at 17, I would decline to abstain. As Plaintiffs correctly note, *Tribune Co.* is "virtually directly on point" (Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss ("Plaintiffs' Opposition") at 44); it, too, involved a RICO action alleging a conspiracy to file fraudulent claims for workers' compensation benefits. In that case, the Second Circuit held that, although New York does have a mechanism permitting the re-opening of workers' compensation claims before the WCB on grounds of fraud, N.Y. Work. Comp. Law § 123, "timely and adequate state-court review" of Tribune's claims was unavailable. *Tribune Co.*, 66 F.3d at 17. The Second Circuit noted, among other things, that the WCB could not require a claimant to return money already paid, that the plaintiffs' RICO claims could not be adjudicated in proceedings before the WCB, and that the WCB could not award the treble damages or attorneys' fees that are available under RICO. Since the Supreme Court's distillation of the *Burford* doctrine predicated abstention on the availability of "timely and adequate state-court review," *New Orleans Pub. Serv.*, 491 U.S. at 361, the Second Circuit found abstention was inappropriate. For these same reasons, *Burford* abstention is inappropriate in this case.

### C. Preemption under the McCarran-Ferguson Act

Defendants argue that the McCarran-Ferguson Act ("MFA"), *supra*, preempts Plaintiffs' RICO and RICO conspiracy claims. The MFA provides, in pertinent part, that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In other words, the MFA "precludes application of a federal statute in face of state law 'enacted ... for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999).

The parties agree that the only element at issue in determining whether the MFA preempts Plaintiffs' RICO and RICO conspiracy claims is whether those federal laws would "invalidate, impair, or supersede" New York law. A similar question was presented in *Humana Inc. v. Forsyth*, *supra*, in which the Supreme Court addressed the question of whether RICO proscribed conduct that the Nevada state insurance laws at issue in that case permitted. The Court held that RICO could be "applied in ... harmony with the State's regulation" and enunciated the following rule: "When federal law is

applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran–Ferguson Act does not bar the federal action." 525 U.S. at 303.

**\*8** In *State Farm Mutual Automobile Insurance Co. v. Grafman*, 655 F. Supp. 2d 212 (E.D.N.Y. 2009), I expressly relied on the rule enunciated in *Humana* in finding that State Farm's RICO claims were not preempted by New York's No-Fault Law. I held that the RICO claims "supplement[ed], rather than disturb[ed], New York's insurance regime by providing another vehicle by which to carry forth the substantive policies of the State of New York." *Id.* (internal quotation marks omitted). As Defendants themselves acknowledge, this case "stands directly against [their] MFA arguments." (Defendants' Memo at 42)

Although Defendants correctly note that *Grafman* involved New York's No-Fault Law rather than the WCL, (*id.*), *Zenith Ins. Co. v. Eisenberg*, 1996 WL 588467 (9th Cir. 1996), is nearly identical to this case. In that case, Zenith alleged that a doctor, a lawyer, and others violated RICO and California fraud laws by 1) recruiting uninjured workers to file fictitious workers' compensation claims against employers insured by Zenith, and (2) overbilling Zenith for medical and legal services to workers whose employers were insured by Zenith. In arguing that the RICO claims were preempted under the MFA, the defendants asserted that "application of RICO would 'impair' California law because Zenith's action for damages would upset the delicate balance established by the California Legislature when it created the workers' compensation system." *Id.* at \*2. The Ninth Circuit rejected this argument, citing to an earlier decision in which it had held that "state and federal laws proscribing identical conduct do not conflict with or displace each other, and may coexist under the McCarran-Ferguson Act." *Id.* (citing *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486, 1492 (9th Cir. 1995)).

Although *Zenith* involved California's workers' compensation law and not the New York WCL, the rationale in that case is applicable here. Defendants have not established that RICO conflicts with, or displaces, provisions of the WCL. To the contrary, here, as in *Grafman*, the RICO provisions supplement, rather than disturb, New York law by serving to prevent fraud.

The only case cited by Defendants in which a federal statute was held to be preempted by the MFA—*National*

*Union Fire Insurance Company of Pittsburgh, PA v. Seneca Family of Agencies*, 255 F. Supp. 3d 480 (S.D.N.Y. 2017)—is inapposite. In that case, insurers petitioned to compel the defendant to arbitrate a workers' compensation dispute pursuant to the Federal Arbitration Act (the "FAA"). In holding that the MFA required that he abstain from ruling on the motion to compel, Judge Koeltl noted that there was a direct conflict between California Insurance Code § 11658.5, which required arbitration in California, and § 4 of the FAA, which required that the arbitration be held in the district where the petition is filed. No such direct conflict exists in this case.

In sum, Defendant's preemption argument is rejected.

D. RICO and RICO Conspiracy

The Joint Memo seeks to dismiss the RICO and RICO conspiracy claims on the grounds that the FAC "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(6)(6). To survive a such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*9** When considering a Rule 12(b)(6) motion to dismiss, a court "accepts as true all well-pleaded factual allegations in the complaint, [and] draws all reasonable inferences in favor of the nonmoving party ...." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (internal quotation marks omitted). However, "[l]egal conclusions, standing alone, are not entitled to the assumption of truth unless supported by factual allegations that plausibly give rise to an entitlement to relief ...." *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 166 (2d Cir. 2024) (internal quotation marks omitted). "A plaintiff may satisfy the plausibility standard by pleading facts upon information and belief," *Evergreen E. Coop. v. Whole Foods Mkt., Inc.*, 2023 WL 545075, at \*2 (2d Cir. Jan. 27, 2023), but "[t]hose magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.' " *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

In ruling on a Rule 12(b)(6) motion to dismiss, consideration is limited to "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," as well as any document "where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted). I therefore will consider the Affidavits attached as Exhibits 1–6 to the FAC on this motion to dismiss.[6] I will not, however, assume the truth of the medical opinions expressed in the Affidavits.[7]

### 1. Proximate Causation

The FAC's first and second claims are brought pursuant to 18 U.S.C. § 1964(c), which creates a private cause of action that allows "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962" to sue in federal district court and recover treble damages, costs, and attorney's fees. The Supreme Court has repeatedly instructed that "§ 1964(c)'s 'by reason of' language demands 'some direct relation between the injury asserted and the injurious conduct alleged.' " *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). To establish injury "by reason of" a violation of section 1962, a plaintiff "is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (internal quotation marks omitted). In their Joint Memo, Defendants argue that Defendants' actions were not the proximate cause of Plaintiffs' monetary losses.

**\*10** The proximate cause inquiry focuses "on the directness of the relationship between the conduct and the harm." *Id.* at 12. As the Supreme Court recently stated: "The key word is 'direct'; foreseeability does not cut it." *Med. Marijuana*, 604 U.S. at 612. A "link that is too remote, purely contingent, or indirec[t] is insufficient." *Hemi Grp.*, 559 U.S. at 9 (internal quotation marks omitted). "Thus, a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts" generally cannot recover under RICO. *Holmes*, 503 U.S. at 268–69.

In determining whether proximate cause exists, the Supreme Court has utilized the "first step" rule—a rule "which limits liability to parties injured at the first step of the causal chain of the defendants' actions." *In re Am. Express Anti-Steering*

*Rules Antitrust Litig.*, 19 F.4th 127, 135 (2d Cir. 2021). When a plaintiff's causation theory requires the court "to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." *Hemi Grp.*, 559 U.S. at 10. The rationale for this exacting "direct relationship" requirement was explained by the *Holmes* Court as follows:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

503 U.S. at 269–70 (internal quotation marks omitted). As the Second Circuit has noted, "the potential for duplicative recoveries created by granting standing to attenuated and indirect parties weighs against finding proximate causation." *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 401 (2d Cir. 1994).

In their Joint Memo, Defendants argue that Plaintiffs' injuries are too remote to sustain the RICO claims. This argument assumes familiarity with indemnity reinsurance —"the insurance of one insurer (the 'reinsured') by another insurer (the 'reinsurer') by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 88 n.3 (2d Cir. 2021) (quoting *In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 89 N.Y.2d 94, 105–06 (1996)). The reinsurer's "only obligation is to indemnify the primary insurer" with which it has a reinsurance contract. *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 79 N.Y.2d 576, 582 (1992). The reinsurer is not directly liable to those insured by the primary insurer and "is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement." *Id.* at 583.

The FAC repeatedly alleges that Roosevelt sustained monetary damages in its capacity as an indemnity reinsurer. It alleges that, as a result of the Fraud Scheme, Roosevelt

"incurred expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal [Services] Defendants on behalf of Claimants." (FAC, ¶ 171) The FAC also expressly alleges that, "[b]ut for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would [be] less significant, resulting in lower settlement value of such claims and lawsuits ...." (*Id.*, ¶ 172)[8]

**\*11** These factual allegations do not make out a direct relationship between Defendants' actions and Plaintiffs' alleged monetary damages. Under Plaintiffs' own theory of causation, Roosevelt's losses result from its obligations to reimburse primary insurers for the inflated amounts that they paid in connection with workers' compensation and general liability claims brought by the Legal Services Defendants as part of the Fraud Scheme. The FAC describes Roosevelt's alleged injuries as "[a]ctual and consequential damages for the payments [Roosevelt] ... made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Laws and New York's Labor Laws." (FAC, ¶ 183(a))

Under this theory of liability, Roosevelt was not injured at the first step of the causal chain resulting from Defendants' alleged actions. Indeed, one could argue—as Defendants do in their Joint Memo—that "Plaintiffs' asserted injuries are several steps removed from any of the Defendants' allegedly fraudulent conduct." (Joint Memo at 6) Under this argument, the allegedly fraudulent conduct first resulted in workers' compensation claims against the Claimants' employers and/or personal injury lawsuits pursuant to New York's Labor Law against contractors or property owners (the first step). The employers and/or contractors and/or property owners then filed insurance claims with their workers' compensation or general liability carriers (the second step), which paid the claims and sought reimbursement from their reinsurer, Roosevelt (the third step). However, even if one were to combine the first and second steps in recognition of the fact that insurance companies usually have a contractual duty to defend claims against their insureds, Roosevelt's losses would still be two steps removed from Defendants' alleged misconduct. The relationship between the Defendants' actions and Roosevelt's financial injury would still be insufficiently direct under the "first step rule."

With respect to Tradesman, the allegations concerning the relationship between Defendants' actions and Tradesman's injuries are too conclusory and vague to permit proximate causation to be inferred. The FAC alleges that Tradesman is "a management general agency that provides management services to various insurers and reinsurers, including ... Roosevelt." (FAC, ¶ 180) These services allegedly include "general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions" arising from general liability and workers' compensation claims. (*Id.*) The FAC alleges that, in this role, Tradesman "made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service[s] Defendants as part of the Fraud Scheme." (*Id.*, ¶ 181)

**\*12** The FAC does not allege who the recipients of the "substantial payments" are. However, even assuming that the "substantial payments" were made to Claimants, there is nothing to suggest that Tradesman made such payment of its own volition and from its own accounts. To the contrary, Plaintiffs' Opposition states that Tradesman investigates claims "in cooperation with its insurers and reinsurers" and only "makes recommendations regarding the payment of claims and settlement of lawsuits to insurers and reinsurers." (Plaintiffs' Opp. at 6) This suggests that, even if Tradesman played a role in processing payments to Claimants, insurers and reinsurers authorized and covered those payments. If so, there is no basis to infer that Defendants' conduct was the proximate cause of Tradesman's injury.

Indeed, the FAC does not allege the specific cause of the injuries Tradesman sustained. To be sure, the FAC alludes to "expenses incurred for the administration of these claims and the retention of additional staff to perform investigative and support services for claims" submitted by Legal Services Defendants. (FAC, ¶ 183(b)) But there is nothing in the FAC to suggest that Tradesman was not compensated for these expenses by the insurers and reinsurers for which it worked, or that the additional staff was necessitated by Defendants' alleged misconduct rather than Tradesman's contractual duty to scrutinize every claim.

The FAC also alleges that, "[d]ue to Defendants' perpetration of the Fraud Scheme, numerous insurance carriers have ceased to write Workers' Compensation and/or general

liability policies in the State of New York, which has resulted in damage to Tradesman's business." (FAC, ¶ 182). These allegations are reminiscent of those that the Securities Investor Protection Corporation ("SIPC") made in *Holmes*. In that case, SIPC brought a RICO claim against Holmes, alleging that his participation in a stock manipulation scheme had resulted in the bankruptcy of two broker-dealers insured by SIPC. The Supreme Court held that SIPC's reimbursement of the broker-dealers' customers was not proximately caused by Holmes's action, stating "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Holmes*, 503 U.S. at 271. Here, the link between Defendants' actions and Tradesman's injuries is contingent on the harm allegedly suffered by the insurers who abandoned the New York market. As in *Holmes*, this link is too remote to support proximate causation.

For the reasons set forth above, I conclude that Plaintiffs have not alleged the direct relationship between Defendants' allegedly fraudulent acts and Plaintiffs' alleged injuries that is required to state a RICO or RICO conspiracy claim.[9] Judge Gonzalez recently reached a similar conclusion in *Roosevelt Road Re, Ltd. v. Subin*, 2025 WL 1713109 (E.D.N.Y. June 19, 2025), a RICO action brought by Plaintiffs against different defendants. The complaint in that case was very similar to the FAC, alleging a fraudulent scheme that is nearly identical to the Fraud Scheme alleged in this case. Judge Gonzalez persuasively concluded that Roosevelt's injuries were "[m]ultiple steps away from the alleged fraud," being "derivative of an injury to a third party." *Subin*, 2025 WL 1713109, at *6 (internal quotation marks omitted). He also concluded that Tradesman's alleged injury was "the derivative result of a fraudulent scheme targeting construction employers or perhaps the Workers' Compensation Board" and that, even assuming that Tradesman suffered a cognizable injury as a result of defendants' actions, the court would have to "look well beyond the first step to locate it." *Id.* at *5 (internal quotation marks omitted).

**\*13** In contrast, in the cases relied upon in Plaintiffs' Opposition, there is a much more direct relationship between the defendants' actions and the plaintiffs' injuries than exists in this case. In *State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical Practice P.C.*, 120 F.4th 59 (2d Cir. 2024), State Farm brought a RICO action alleging that the defendants—health care providers and related individuals and entities that treat automobile accident victims—directly defrauded the insurance company by providing medically

unnecessary treatment and services, then bringing baseless arbitrations and state court proceedings when State Farm refused to pay the defendants' claims. Similarly, in *Allstate Insurance Co. v. Seigel*, 312 F. Supp. 2d 260 (D. Conn. 2004), Allstate's RICO claim was based on allegations that the defendants—a doctor, his medical practice, and an employee/shareholder of the practice—had "created false and fraudulent invoices and medical reports on patients who had been involved in automobile accidents for the purpose of causing insurers such as Allstate to pay for medical treatments that were either never performed or were incompletely performed and/or to pay inflated amounts for the personal injury claims of those patients." *Id.* at 261–62. In both of these cases, the plaintiff insurance companies were the direct victims of the defendants' predicate acts.

### 2. Association-in-Fact Enterprise

Even if the FAC adequately alleged that Plaintiffs' injuries were proximately caused by the alleged RICO violation, the RICO claim would be dismissed for failure to adequately allege an association-in-fact enterprise. "To sufficiently allege that the defendant violated RICO, a plaintiff must plead four elements: (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." *Entretelas Americanas S.A. v. Soler*, 840 F. App'x 601, 603 (2d Cir. 2021) as amended (Jan. 7, 2021) (internal quotation marks omitted). The RICO statute defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Thus, there are "two categories of associations that come within the purview of the 'enterprise' definition": 1) "organizations such as corporations and partnerships, and other 'legal entities' " and 2) "any union or group of individuals associated in fact although not a legal entity." *United States v. Turkette*, 452 U.S. 576, 581–82 (1981). The FAC alleges that the enterprise at issue in this case fits within the latter category, stating that Defendants are "a group of individuals and legal entities associated in fact ...." (FAC, ¶ 185)

Since the RICO statute is to be "liberally construed," the Supreme Court has given a broad and flexible reach to the term "association-in-fact." *Boyle v. United States*, 556 U.S. 938, 944 (2009). However, RICO associations-in-fact must exhibit "three structural features: (1) a shared purpose; (2) relationships among the associates; and (3) 'longevity sufficient to permit these associates to pursue the enterprise's

purpose.' " *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) (quoting *Boyle,* 556 U.S. at 946).

Defendants argue that the FAC does not adequately allege the first two of these features. First, the Gorayeb Defendants argue that they do not share a common purpose with the other defendants. Second, the Joint Memo argues that Defendants lack the requisite interpersonal relationships necessary to establish an association-in-fact. I agree with Defendants on both points.

First, "[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purpose[ ]." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004). Proof that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates, ... [is] not ... enough to show that the individuals were members of an enterprise." *Boyle,* 556 U.S. at 947 n.4. "Nor does [an] allegation that ... various [d]efendants and subgroups agreed at different times to engage in various fraudulent schemes plausibly support the inference, essential to a RICO association-in-fact enterprise, that they acted with a sufficiently common purpose." *D'Addario*, 901 F.3d at 101–02.

 **\*14**  As the Gorayeb Defendants correctly note, the "FAC pleads no facts indicating that the disparate defendants functioned as a unit or supporting an inference that they had a common interest in the success of the so-called enterprise." (Gorayeb Defendants' Supplemental Memorandum of Law at 13) Indeed, the allegations in the FAC make it clear that Defendants were pursuing their own individual aims, not a common objective. The Gorayeb Defendants represented Claimants in personal injury lawsuits and allegedly sought to inflate the settlement value of those lawsuits for their own financial gain. Similarly, the Fogelgaren Defendants filed workers' compensation claims and sought to maximize the value of those claims. Although these Legal Services Defendants may have referred Claimants to one another and to various Medical Provider Defendants, the FAC does not allege that they shared their profits from the Fraud Scheme with each other or with other Defendants. To the contrary, the FAC states that Legal Services Defendants rewarded the Medical Provider Defendants only by continuing to "funnel patients to their offices." (FAC, ¶ 43)

Medical Service Providers may have benefitted financially from the Fraud Scheme, but only because they billed workers' compensation insurance for "unnecessary, excessive, unwarranted and costly medical services and/or medical services that were not causally related to the alleged workplace accident ...." (FAC, ¶ 42) In this regard, the Medical Service Providers were acting independently, for their own purposes, and without coordination with the other Defendants. To be sure, one Medical Service Provider's allegedly fraudulent behavior may have benefitted other Defendants. For example, exaggerated radiological findings may have been used to justify unnecessary physical therapy or surgery, which was then performed by another defendant or at another defendants' facility. But the FAC does not allege facts suggesting that one defendant intended to benefit any other defendant.

Second, I agree with Defendants that the FAC does not allege the sort of "interpersonal relationships" between them that is necessary to establish an association-in-fact enterprise. *Boyle,* 556 U.S. at 946. As the Second Circuit has noted, a number of district courts in this Circuit "have found that a group of individuals related by a structure that mimics so-called 'rimless hub-and-spoke' conspiracies cannot be considered a RICO association-in-fact." *D'Addario*, 901 F.3d at 101 (citing cases). "In other words, when each defendant is alleged to have a relationship with a central figure, but the defendants are not all alleged to be connected in some overarching way (such as by an agreement to further a single design or purpose), these courts have found no RICO association-in-fact." *Id.* (internal quotation marks omitted). "Without such a limitation, ... one malefactor's series of independent frauds could ... sweep[ ] numerous other individuals into a net of heightened liability under RICO, ... even if each fraud was perpetrated quite independently of the others." *Id.*

The Second Circuit applied this limitation in *D'Addario*, in which the plaintiff alleged that her brother and other executors of her father's estate violated RICO by engaging in fraudulent schemes designed to deplete the estate and deprive the plaintiff of her inheritance. The Second Circuit found that the allegations of the complaint, if true, would establish that the brother engaged in a series of frauds involving different sets of individuals. However, those allegations did not support an inference that the defendants agreed to join forces with each other to pursue a goal of defrauding the estate. At most, the allegations suggested that the "[d]efendants (and in a few cases, perhaps, a small subgroup of [d]efendants) each agreed with [the brother] to engage in individual schemes." *Id.* at 101.

The Second Circuit concluded that these allegations did not "plausibly make out [an] association-in-fact enterprise." *Id.* at 102.

The FAC resembles the complaint in *D'Addario.* It casts Gorayeb as the central figure in the Fraud Scheme, alleging that he "orchestrated, coordinated and led" it. (FAC, ¶ 185) If the case involved workers' compensation claims, the Gorayeb Defendants referred those claims to the Fogelgaren Defendants, who then either joined or replaced the Gorayeb Defendants as central figures in the Scheme. The FAC implies that the Legal Services Defendants referred Claimants to each other with the expectation of reciprocity, but the pleading does not suggest that there was anything illegal or improper about this referral arrangement.

**\*15** These Legal Services Defendants then allegedly engaged in a series of frauds with the Medical Provider Defendants to whom they referred the Claimants. The FAC implies that the Legal Services Defendants referred Claimants to Medical Provider Defendants who had shown a propensity to exaggerate the nature and severity of alleged injuries in the hopes of obtaining future referrals. However, the FAC does not allege coordination among the Medical Provider Defendants. Indeed, the only indication of any interaction between these defendants is contained in the Affidavits attached to the FAC, which suggest nothing more than routine medical referrals from one provider to another. There are no facts suggesting the sort of interpersonal interactions necessary to make out a RICO enterprise.

Because I conclude that Plaintiff's RICO claim must be dismissed for the reasons set forth above, there is no need to address Defendants' arguments that the racketeering activity and predicate acts are insufficiently pleaded. However, I have reviewed the 93 predicate acts alleged in Exhibit 7 to the FAC and find that none of the allegations in Exhibit 7 rectify the proximate causation and association-in-fact deficiencies.

### 3. RICO Conspiracy

"[T]he existence of a RICO enterprise is not a required element of a RICO conspiracy claim." *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014). However, Plaintiffs' RICO conspiracy claim fails because, although the FAC contains conclusory allegations of an agreement between Defendants, it does not allege facts that plausibly support such allegations.

"Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). A RICO conspiracy claim "should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (quoting 1 Arthur F. Mathews, *et al.*, Civil Rico Litigation § 9.07 (2d ed.1992)). "Bare or conclusory allegations of participation in a conspiracy ... will not avail on a motion to dismiss"; plaintiffs "must plead allegations that each defendant knowingly agreed to participate in the conspiracy, particularly when the predicate acts alleged are fraud." *Com-Tech Assocs. v. Computer Assocs. Int'l*, 753 F.Supp. 1078, 1092 (E.D.N.Y. 1990).

Plaintiffs' RICO conspiracy claim relies on bare and conclusory allegations, without any specificity whatsoever. It principally alleges that "Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d)." (FAC, ¶ 192) But the FAC does not allege facts suggesting that there was an agreement between the Defendants. Indeed, some of the Medical Provider Defendants were competitors, and there is nothing to suggest that the Medical Provider Defendants knew any Defendants other than those who referred business to them or those to whom they referred business. Accordingly, the FAC does not state a claim for RICO conspiracy.

### E. Leave to Amend

Plaintiffs' Opposition conclusorily states that Plaintiffs can amend the FAC if "the pleading of additional facts [is] necessary to correct any deficiencies in the FAC." (Plaintiffs' Opp. at 45) Following oral argument, Plaintiffs filed a letter dated December 31, 2025, in which they expressly request leave to amend their pleading to correct any deficiencies with respect to the proximate causation issue. In Defendants' letter of December 31, 2025, they oppose granting leave to amend the FAC, arguing that Plaintiffs' proposed amendments contradict allegations in their previous filings; would be futile; and would occasion undue delay, resulting in prejudice to Defendants.

**\*16** Having considered the parties' positions, I will dismiss the RICO and RICO conspiracy claims without prejudice to Plaintiffs moving pursuant to Fed. R. Civ. P. 15(a) for leave to amend the complaint to address the deficiencies here identified in those two claims. That motion must include a copy of the proposed amended pleading, *see* Local Civil Rule 15.1(a), and shall also include a redlined version comparing the proposed amended pleading to the FAC. The proposed amended complaint shall address only the deficiencies identified in this Opinion and Order and shall be served on Defendants within 30 days of the date of this Opinion and Order. Defendants shall have 30 days from service of that motion in which to serve a response on Plaintiffs, and Plaintiffs shall have 15 days from service of the opposition papers in which to serve a reply and file the fully briefed motion.

### F. Declaratory Judgment

Count V of the FAC requests declaratory relief pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201.[10] That Act does not "provide an independent cause of action." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). It "only provides courts with discretion to fashion a remedy," *Sunvestment Energy Grp. NY 64 LLC v. Nat'l Grid USA Servs. Co.*, 116 F.4th 106, 113–14 (2d Cir. 2024), by authorizing a court to "enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d at 731. Since Count V does not state a federal claim upon which relief may be granted, it is dismissed with prejudice.

### G. Supplemental Jurisdiction and Motions to Dismiss the State Law Claims

Counts III and IV allege claims for common law fraud and unjust enrichment, respectively. Defendants argue that, if the court dismisses Plaintiffs' federal claims, it should decline to exercise supplemental jurisdiction over these two state law claims. Defendants also advance substantive arguments for dismissing these two claims if the court decides to exercise supplemental jurisdiction.

The court has subject matter jurisdiction over these claims only pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367. That statute provides, among other things, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, the statute also provides that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction ...." *Id.*, § 1367(c).

"In deciding whether to exercise jurisdiction over supplemental state-law claims, district courts should balance the values of judicial economy, convenience, fairness, and comity—the 'Cohill factors.' " *Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see also Klein & Co. Futures*, 464 F.3d at 262 ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.")

**\*17** After considering the *Cohill* factors, I find that this is a "usual case" in which the factors point toward declining to exercise jurisdiction over the remaining state law claims. Accordingly, I decline to exercise supplemental jurisdiction over the two state law claims. However, if Plaintiffs elect to move for leave to amend the FAC and that motion is granted, I may reassess this decision.

### CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss the FAC's RICO and RICO conspiracy claims are granted without prejudice to Plaintiffs moving for leave to amend these two claims in an attempt to cure the deficiencies identified here. Such a motion must be filed within 30 days of the date of this Opinion and Order, attach a proposed amended complaint that cures the deficiencies identified here, and include a redlined version comparing the proposed amended complaint to the FAC.

Defendants' motion to dismiss Count V of the FAC is granted, although the proposed amended pleading may seek declaratory relief in connection with other claims. The court declines to exercise supplemental jurisdiction over the state law claims set forth in Counts III and IV of the FAC, but may

reassess this decision if Plaintiffs move for leave to amend the FAC and the proposed amended pleading states a RICO and/ or RICO conspiracy claim.

**SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 682192

Footnotes

1    Plaintiffs voluntarily dismissed Surgicare of Westside, LLC, in February 2025, about one month before the Joint Motion was filed. An eighth Supplemental Motion, filed by defendant Andrew Merola, M.D., was rendered moot in September 2025, when Plaintiffs voluntarily dismissed their claims against Dr. Merola.

2    By notice filed January 15, 2026, Plaintiffs voluntarily dismissed defendant Bergman from the action.

3    The seven pending Supplemental Motions have been filed on behalf of the Fogelgaren Defendants, the Gorayeb Defendants, the NY Ortho Defendants, the Weinstein Defendants, the Kolb Defendants, Lenox Hill, and Dr. Sharma. Surgicore is the only defendant which has not filed a Supplemental Motion, but it is among the Defendants that signed the Joint Motion.

4    Since I conclude that these fundamental deficiencies mandate dismissal of the RICO claims, this Opinion and Order does not address Defendants' arguments that the racketeering activity and predicate acts are insufficiently alleged. If Plaintiffs propose amendments to their pleading that cure these deficiencies (*see* Subsection E, below), Defendants may renew these arguments in a motion to dismiss that amended pleading without re-briefing.

5    Defendants also argue that Plaintiffs have not alleged RICO or "statutory standing." However, as the Joint Memo itself acknowledges, the Supreme Court has "clarified that what has been called 'statutory standing' in fact is not a standing issue," but "a question of whether the particular plaintiff 'has a cause of action under the statute.' " Joint Memo at 4 n.3 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27 (2014)). "[B]ecause the absence of a valid ... cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case," this argument "does not belong to the family of standing inquiries ...." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (internal quotation marks omitted).

6    The Joint Memo argues that the court should not consider these Affidavits in deciding this motion because they are not "written instruments" as contemplated by Rule 10(c) of the Federal Rules of Civil Procedure. However, the Second Circuit "has permitted the consideration of other documents, apart from written instruments under Rule 10(c), at the motion to dismiss stage, such as 'documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.' " *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)). Since Plaintiffs themselves characterize the Affidavits as "integral to the FAC" (Plaintiffs' Opp. at 16), it is clear Plaintiffs knew of, and relied upon, the Affidavits in bringing the lawsuit and in filing the FAC.

7    As the Second Circuit has noted, Rule 10(c) does not "require[ ] a plaintiff to adopt as true the full contents of any document attached to a complaint or adopted by reference." *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995). At oral argument, Plaintiffs made it clear that they attached the Affidavits only to establish their basis for alleging that the Medical Provider Defendants engaged in fraudulent conduct and are not asking the court to assume that the medical opinions expressed therein are true.

8    Although the FAC alleges that the Gorayeb Defendants used the Medical Provider Defendants' false diagnoses and the record of extensive medical services to "fraudulently inflate the settlement values of personal injury lawsuits in order to extract greater settlement from general liability carriers, including from ... Roosevelt," (FAC, ¶ 44), it does not allege facts to suggest that Roosevelt was operating as a general liability carrier at any times relevant. Rather, as described in the text, the FAC explicitly alleges that Roosevelt's monetary losses resulted from its reinsureds' payment of inflated claims, which triggered Roosevelt's obligation to reimburse the reinsureds.

9       In an effort to stave off dismissal for lack of proximate causation, Plaintiffs asserted facts at oral argument that were markedly different from those pled in the FAC. These facts cannot be inferred from the FAC itself.

Plaintiffs have requested leave to amend their pleading. Defendants oppose that request for various reasons. As explained in section E below, Plaintiffs are granted leave to move to amend their pleading to address the deficiencies addressed in this subsection (and elsewhere in this opinion).

10      The DJA provides, in pertinent part, that, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.